In re MARRIAGE OF MARSHA D. LEFF, Petitioner-Appellant, and ALAN H. LEFF, Respondent-Appellee.

Second District   Nos. 2—85—0777, 2—85—0953, 2—86—0031, 2—86—0157 cons.

Opinion filed October 29, 1986.

Stephen G. Applehans and William G. Rosing, both of Rosing, Applehans & Smith, Ltd., of Waukegan, for appellant.

Stephen H. Katz and Deborah S. Daly, both of Stephen H. Katz, Ltd., of Waukegan, for appellee.

JUSTICE UNVERZAGT delivered the opinion of the court:

The appellant, Marsha D. Leff (Marsha), appeals from the judgment of the circuit court of Lake County and from the subsequent amendments and revisions thereto, granting her counterpetition for legal separation, which was filed in response to the petition for dissolution filed by her husband, Alan H. Leff (Alan), appellee herein. She contends that portion of the trial court's judgment which ordered the sale and division of marital property was entered without statutory authority and must be vacated. In the alternative, she contends the court's valuation and division of property was an abuse of discretion and its award of maintenance was not equitable. She also contends the court's award of custody of Randee Leff, one of the parties' three children, to Alan was based on improper evidence and was an abuse of discretion. On her motion, notices of appeal filed by her from the trial court's original and amended judgments were consolidated.

After a hearing before the trial court, judgment was entered granting the parties legal separation. The judgment included the determination that the parties' previously shared residence was marital property, ordered its immediate sale, and set forth a division of the net proceeds. It also set forth the division of the remainder of the parties' marital property, awarded Alan the sole care, custody, control, and education of the parties' three minor children, and awarded Marsha maintenance of $182.50 per week. Marsha filed an "Emergency Motion to Stay Entry of Judgment and for New Trial" which, *inter alia*, challenged the trial court's authority to divide and award the marital property in a legal separation proceeding.

Marsha argues that cases decided prior to enactment of the Illinois Marriage and Dissolution of Marriage Act (IMDMA) (Ill. Rev. Stat. 1977, ch. 40, par. 101 *et seq.*), which recognized the right of the trial court to adjudicate the property interests of parties to a proceeding for legal separation, no longer provide authority for such adjudication. In particular, she argues the exception recognized in *Anderson v. Anderson* (1975), 28 Ill. App. 3d 1029, which was relied upon by the trial court as the basis for its authority to make the awards, no longer obtains under the IMDMA since the "[o]peration of the term 'marital property' is not triggered until the time for dissolution." *Kujawinski v. Kujawinski* (1978), 71 Ill. 2d 563, 573.

In *Anderson* the plaintiff contended that Illinois law did not authorize the court to determine property interests in a separate maintenance action. (Ill. Rev. Stat. 1973, ch. 68, par. 22 *et seq.* (now codified as Ill. Rev. Stat. 1985, ch. 40, par. 402).) The court found, however, that "when parties ask the trial court for relief as to certain property

and join issue, they have submitted their property rights to the court, which may then enter a decree concerning that property. *Shapiro v. Shapiro* (1969), 113 Ill. App. 2d 374, 380-82, 252 N.E.2d 93." *Anderson v. Anderson* (1975), 28 Ill. App. 3d 1029, 1033; see also *O'Donnell v. O'Donnell* (1972), 5 Ill. App. 3d 870, 877-78; *Boyd v. Boyd* (1965), 58 Ill. App. 2d 1, 11-12.

Marsha argues that other decisions after the IMDMA's enactment also support her view that the exception is now precluded, citing *In re Estate of Chandler* (1980), 90 Ill. App. 3d 674, *In re Marriage of Schwartz* (1985), 131 Ill. App. 3d 351, and *In re Marriage of Pahlke* (1983), 120 Ill. App. 3d 1009.

Alan distinguishes *Kujawinski* and *Chandler* on their facts, noting that neither case dealt with the exception identified in *Anderson*, nor did *Kujawinski* overrule such an exception. Likewise, we note *Schwartz* relied on *Pahlke* for the general proposition that the court has power to adjust and determine the rights of one party and the property of the other only where a divorce has been granted, and *Pahlke*, in turn, relied on *Chandler* and *Kujawinski* for that general proposition. Accordingly, Alan argues the exception to the rule which permits the parties, in effect, to confer subject matter jurisdiction on the trial court still operates. Alan further argues that Marsha waived her right to object to the court's classification and division of property by not raising the issue until she filed her post-trial motion. Alan asserts that the exception to the rule against division of marital property in a legal separation proceeding was validly applied here, where Marsha filed her petition for legal separation and proceeded to participate in an evidentiary hearing without any objection to the court's jurisdiction until after the court had announced its judgment dividing the property. Marsha testified at the hearing, which hearing was described in the record as "the second part of a bifurcated trial to determine division of assets, assignment of debts, maintenance and child support." Marsha offered affirmative evidence with regard to the ownership of the marital home and testified the home was a gift to her "to secure her future," as against Alan's claim that he quitclaimed the residence to her only as a hedge against a potential malpractice action against him. She testified to her monthly mortgage and utility expenses and about repair, remodeling, and decorating projects she performed on the house. She also testified concerning her health, debts owed, the extent to which she assisted Alan with his business, and that she had hired two accountants to establish the value of Alan's accountancy practice. "Closing Arguments" were submitted by the parties' respective attorneys by way of letter to the court. Each suggested a pro-

posed distribution of the parties' property: Alan's suggested the marital residence be sold and that all of the parties' debts be paid; further, that no maintenance be awarded and that the question of child support be reserved. Marsha's suggested a 50-50 split of marital and nonmarital property, sought maintenance, and sought child support for those times when the children would be visiting her. In particular, Marsha's suggested equitable distribution of the property was set forth "pursuant to section 503 [Ill. Rev. Stat. 1985, ch. 40, par. 503]," and suggested that she receive the residence at 839 Edgewood Court in Highland Park, the marital residence, furniture and furnishings in the residence, the 1979 Bonneville automobile, her engagement ring, jewelry, fur coat, and other personal property. She suggested that Alan receive the residence at 1393 Ridge Road in Highland Park, the home he purchased so that he and the children would have a place to live, the furniture and furnishings in the residence, his interest in the partnership of Leff & Klein, Ltd., cash, certificates of deposit and other assets, the Buick and Pinto automobiles. It was after the court announced its decision by letter, with direction to Alan's attorney to draft an order, that Marsha filed her emergency motion to stay the entry of the judgment and for a new trial.

Marsha argues here that the evidence she offered by way of her testimony should not be viewed as her having "joined the issue" of the property division with Alan, since she contends such evidence was "necessary to be adjudicated in order for the court to fairly and equitably award *possession* of the property and separate maintenance during the period of separation." Further, she argues she should not be held to have waived her objection to the trial court's jurisdiction in view of her post-trial motion, since it was implied in *Anderson* that such a motion would preserve the objection.

▮▮ We agree with Alan that the previously recognized exception to the court's lack of authority to divide assets in an action for legal separation may still be established even under the present provisions of the IMDMA. In *Kujawinski* the court was addressing a challenge to section 801 of the IMDMA wherein it was alleged by the plaintiff that section 801 retrospectively applied the "marital property" provisions of section 503(b) and thereby precipitated an unconstitutional impairment of the obligation of contracts and an unconstitutional deprivation of property without due process of law. Plaintiff there contended that the effect of that section was to convey to a spouse a partnership interest in property which became operative during the marriage and was effective regardless of whether the marriage was ever dissolved. Pointing out that plaintiff conceded section 503(b) must be read in con-

sort with sections 503(a) and 503(c), the court noted:

"[Those] three provisions are based on former section 307 of the Uniform Marriage and Divorce Act. The explanatory note accompanying that section clearly establishes its limited function. It resolves that 'marital property' is defined 'only for the purposes of division on dissolution of marriage or legal separation. No attempt is made to regulate the respective interests of the spouses in property during the existence of the marriage.' (Uniform Marriage and Divorce Act (U.L.A.) sec. 307, Commissioners' Note, at 492 (1973).) This function comports with the legislative purposes enunciated in section 102 of the Illinois act. These legislative purposes include mitigating the potential harm caused by the process of legal dissolution, making reasonable provision during and after litigation, and eliminating the consideration of marital misconduct in the adjudication of rights and duties incident to the legal dissolution of marriage, legal separation and declaration of invalidity of marriage. (Ill. Rev. Stat. 1977, ch. 40, pars. 102(4), (5), (6).)" *Kujawinski v. Kujawinski* (1978), 71 Ill. 2d 563, 572-73.

Thus, the court determined that the act does not purport to affect property interests during the marriage, nor does section 503(b) prevent married persons "from owning property separately during the marriage and disposing of it in any fashion that the property-owning spouse may choose." 71 Ill. 2d 563, 573.

Clearly, the former separate-maintenance statute (Ill. Rev. Stat. 1975, ch. 68, par. 22 *et seq.*) also did not provide that the court adjudicate property rights, yet, as noted above, such adjudications were held valid in certain situations. In *Boyd v. Boyd* (1965), 58 Ill. App. 2d 1, the original complaint by plaintiff was for divorce and prayed for a property-rights determination. Defendant's counterclaim for separate maintenance prayed that an equitable award be made of the property of the parties. The court dismissed the divorce action, decreed separate maintenance, and determined the parties' property rights. It reasoned that since plaintiff had submitted the issue of determination of property rights to the court in the divorce action and had joined this issue with defendant, he could not then be heard to attack the jurisdiction of the court. Acknowledging *Boyd*, the court in *Shapiro v. Shapiro* (1969), 113 Ill. App. 2d 374, determined that, by virtue of the acts of the parties throughout the course of the litigation before it, there was a joining of the issues sufficient to sustain the court's jurisdiction. The plaintiff there had originally filed a complaint for separate maintenance without mention of property adjudication. The defendant

filed a counterclaim for divorce, specifically submitting the property rights to the court for determination. The plaintiff submitted to all inquiries required to determine rights in the disputed property, without objection to the court's jurisdiction. The court found that the defendant had failed to prove his case for divorce, and when he filed his "Objections to Proposed Decree for Separate Maintenance," he recognized that the property-rights issues had been joined and submitted to the court. The plaintiff filed an answer to the defendant's objections in which she, too, recognized the court's jurisdiction to determine her property rights. "Thus, in effect, both parties conceded that they had submitted their property rights to the court." 113 Ill. App. 2d 374, 382.

The court in *O'Donnell v. O'Donnell* (1972), 5 Ill. App. 3d 870, acknowledged that the general rule that the court was without jurisdiction to award property interests in a separate maintenance action was being "impinged upon in a line of cases [*e.g., Boyd, Shapiro*] which seemingly hold that where parties in an action for Separate Maintenance (sometimes coupled with a Counterclaim for Divorce) have prayed for this relief, joined issue and introduced evidence concerning property interests, the Court may enter a decree awarding interests in the property of the parties. [Citations.]" (5 Ill. App. 3d 870, 878.) Even assuming the validity of the exception, the *O'Donnell* court found the parties before it had not "joined issue" on the question. It noted that the defendant, who had sought such adjudication in her divorce action, consistently denied the authority of the court to make such an award in the separate maintenance action. Neither party offered any evidence on the question of the division of real and personal property. No pleadings set forth how title was held or the legal description of premises; no deed was offered in evidence; neither party testified how the property was purchased, who contributed what to the purchase price, what the purchase price was, or what the present value of the property was. The plaintiff offered no evidence whatever as to his needs, income, expenses, or requirements, and he alleged only that he required possession of the property.

In *Anderson v. Anderson* (1975), 28 Ill. App. 3d 1029, the plaintiff contended that the determination of property rights in connection with a separate maintenance proceeding was improper. Relying on the exceptions set forth in *Shapiro v. Shapiro* (1969), 113 Ill. App. 2d 374, the court found that plaintiff alleged defendant's ownership of company stock in her original complaint for divorce and her amended complaint for separate maintenance. The defendant admitted ownership of the stock. The issue to be resolved regarding this stock was plaintiff's

right to collect from it any amounts which might be due her as a result of the litigation, and it was on her motion that the court sequestered the stock in order to secure a fund from which to pay defendant's obligations. Since it was the plaintiff who put the rights to the stock within the court's consideration, the court found she waived her right to object to its compliance with her request.

The court here found that the issue of the apportionment of marital property was joined by Marsha's conduct in that she actively contested the marital or nonmarital status of property, the fair market values thereof, and requested an apportionment of such marital and nonmarital property "pursuant to section 503." The court also noted the status of the marital residence was raised by Alan's complaint for constructive trust. Marsha's "Motion to Strike" the complaint admitted and denied various allegations therein, and alleged that she had no knowledge of the potential malpractice suit, that she believed Alan had malpractice insurance at the time the quitclaim was executed, and that Alan made statements to her at the time the quitclaim deed was executed "which clearly indicated a gift was intended." The court noted that Marsha's first objection was not made until after the decision to apportion the property was made and she found it unsatisfactory.

■ We believe that under the circumstances presented here it was not error for the court to refuse to vacate its judgment. It is fundamental that a party cannot complain of an error which he induced the court to make or to which he consented. (*In re Marriage of Davies* (1983), 95 Ill. 2d 474.) The rationale of this rule is obvious. It would be manifestly unfair to allow one party a second trial upon the basis of error which he injected into the proceeding. *Auton v. Logan Landfill, Inc.* (1984), 105 Ill. 2d 537, 543.

We conclude that under the circumstances presented in this case, the court had jurisdiction to adjudicate the property interests of the parties.

Marsha next contends the trial court's division of property and award of maintenance was an abuse of discretion. She notes the standard for determining whether there had been an abuse of discretion is set forth in *In re Marriage of Rapacz* (1985), 135 Ill. App. 3d 1045, 1048:

> "The distribution of marital property rests within the sound discretion of the trial court and will not be disturbed absent abuse. (*In re Marriage of Miller* (1983), 112 Ill. App. 3d 203, 207, 445 N.E.2d 811; *In re Marriage of Legge* (1982), 111 Ill. App. 3d 198, 207-08, 443 N.E.2d 1089, *appeal denied* (1983), 93 Ill. 2d 542.) In determining whether the trial court abused its

discretion the question is whether the court, in view of all the circumstances, so exceeded the bounds of reason no reasonable man would take the view it adopted. (*In re Marriage of Miller* (1983), 112 Ill. App. 3d 203, 207, 445 N.E.2d 811; *In re Marriage of Lee* (1979), 78 Ill. App. 3d 1123, 1127, 398 N.E.2d 126.) While the Illinois Marriage and Dissolution of Marriage Act does not mandate equal distribution of marital assets between spouses, the property must be divided in 'just proportion,' taking into account listed factors. (*In re Marriage of Aschwanden* (1980), 82 Ill. 2d 31, 37, 411 N.E.2d 238; *In re Marriage of Sevon* (1983), 117 Ill. App. 3d 313, 318, 453 N.E.2d 866; Ill. Rev. Stat., 1984 Supp., ch. 40, par. 503(d) (formerly par. 503(c)).) The touchstone of proper apportionment is whether it is equitable in nature (*In re Marriage of McNeeley* (1983), 117 Ill. App. 3d 320, 325, 453 N.E.2d 748; *In re Marriage of Campise* (1983), 115 Ill. App. 3d 610, 615, 450 N.E.2d 1333), and each case rests on its own facts. *In re Marriage of Bentivenga* (1982), 109 Ill. App. 3d 967, 972, 441 N.E.2d 336."

See also *In re Marriage of Bauer* (1985), 138 Ill. App. 3d 379, 386.

■ Alan asserts the issue underlying the division and equitable distribution argument is whether the court failed to assign a value to his business, as contended by Marsha. The trial court's letter of decision found the value of Alan's 50% interest in his accountancy practice, Leff & Klein, Ltd., to be "nil" and the judgment entered recited that "the court makes no finding as to the value of counter-respondent's accountancy practice." The court stated in its letter of decision, however, that the "income generated by the enterprise *** will be considered in determining the apportionment of property and the amount of child support and maintenance."

Alan testified at trial that the net worth of his business was "zero," and in his closing-argument letter submitted to the court, Alan argued his theory of the case was that the business itself should not be valued as an asset but, rather, as a means for him to support his children. He cited *In re Marriage of Wilder* (1983), 122 Ill. App. 3d 338, as authority for his position. The *Wilder* court held that the goodwill in a spouse's professional practice need not be assigned a value when a trial court distributes the parties' property upon the dissolution of a marriage. The court's reasoning was that goodwill, which, in effect, is the ability to generate income, was a factor already taken into account under section 503(d) of the IMDMA and that to assign a value to such goodwill would cause double consideration of a single factor under the Act. The *Wilder* court considered that although the respondent's medi-

cal practice there generated substantial income, it appeared to be his only major source of income, which must provide not only for his own reasonable needs but for those of the petitioner and the minor children as well. The court noted its earlier decision in *In re Marriage of Greenberg* (1981), 102 Ill. App. 3d 938, in which it held it was not " 'essential for purposes of complete fairness' " that a definite value be assigned to each item under the circumstances of that case. (*In re Marriage of Wilder* (1983), 122 Ill. App. 3d 338, 347-48.) In *Greenberg* the court did not assign a value to the petitioner's optometry business. The court found no abuse of the trial court's discretion in awarding 38% of the assets plus the optometry business to the petitioner and 62% of the assets to the respondent where there was evidence concerning petitioner's earning potential in the form of testimony concerning his gross income from the business.

At trial here, Alan testified concerning his employment history, and the formation of Leff & Klein, Ltd., which had been in business for three or four years. The business had recently relocated, and desks, office equipment and a $4,000 telephone system were purchased. He testified monthly overhead was $3,000 to $4,000; monthly gross income was $8,000 to $9,000. The parties' joint income tax returns for the years 1982, 1983, and 1984 were admitted in evidence, and Alan testified his "disposable income" for 1984 was approximately $48,000. He testified he hoped his 1985 income would be more, but increases in gross income would be offset by an additional $40,000 to $50,000 in expenses due to increased rent, salaries, and the acquisition of furniture and equipment.

By way of impeachment of Alan's testimony that the net worth of the business was zero, Marsha introduced evidence of his credit application to Norwood Federal Savings & Loan Association wherein he showed the value of the business to be $150,000. Alan stated he showed that value in order to induce the savings and loan to grant the loan application because he was desperate to buy a home so that he and his children would have living quarters. The record shows Marsha introduced no other evidence of the value of the business, although she hired two accountants, and obtained a continuance, in order that an examination of Alan's books and records could be made for the purpose of determining its present status.

A recent decision of this court has found the *Wilder* decision inconsistently applied within its own district, and noted the question of the place of goodwill in valuing professional corporations has been the subject of recent commentary in legal publications. In *In re Marriage of Rubinstein* (1986), 145 Ill. App. 3d 31, 36-37, we considered the

"better view" for a fair and just disposition of marital property requires considering goodwill in valuing professional corporations, and that the trial court's failure to consider the substantial evidence submitted there by appellant concerning the value of the corporation was an abuse of its discretion. We find the instant cause distinguishable from that presented in *Rubinstein*, however, in that Marsha failed to offer any evidence as to the value of the business, save for the loan application, even though she clearly had attempted to gather such evidence. Her failure to offer such evidence under these circumstances creates the presumption, Alan argues, that the evidence would have been unfavorable to her position, and we agree. *Tepper v. Campo* (1947), 398 Ill. 496, 505; *Dollison v. Chicago, Rock Island & Pacific R.R. Co.* (1976), 42 Ill. App. 3d 267, 277.

Although the court is not required to place a specific value on each item of property in considering the value of the property set aside to each spouse, the IMDMA requires that there be sufficient evidence of value in the record to support the court's apportionment. (*In re Marriage of Davis* (1985), 131 Ill. App. 3d 1065; *In re Marriage of Cuisance* (1983), 115 Ill. App. 3d 551.) Further, although the failure of a party to offer evidence of value of certain assets has been held not to constitute a waiver of his or her right to appeal on this issue (*In re Marriage of Reib* (1983), 114 Ill. App. 3d 993; *In re Marriage of Kundit* (1982), 107 Ill. App. 3d 310), such waiver of objection to the lack of evidence of value has been found under certain circumstances. (*In re Marriage of Tyrrell* (1985), 132 Ill. App. 3d 348 (where respondent-appellant was clearly in a position to provide the evidence needed to value the corporation but simply refused to do so); *In re Marriage of Caldwell* (1984), 124 Ill. App. 3d 898 (where respondent-appellant did not present evidence of value even though she had ample opportunity to present evidence on the issue of the value of nonmarital property or to request the court to continue the matter and was specifically asked if other evidence was warranted); see also *In re Marriage of Mullins* (1984), 121 Ill. App. 3d 86 (wife's contention that the court did not receive adequate evidence of valuation of husband's stock in firm of which he was the president and sole stockholder was rejected, where husband did present such evidence and wife failed to present any evidence at all of the value of the stock).) We agree with the court's expression of opinion in *In re Marriage of Smith* (1983), 114 Ill. App. 3d 47, 54-55:

> "[I]t is the parties' obligation to present the court with sufficient evidence of the value of the property. Reviewing courts cannot continue to reverse and remand dissolution cases where the

parties have had an adequate opportunity to introduce evidence but have failed to do so. Parties should not be allowed to benefit on review from their failure to introduce evidence at trial. (*In re Marriage of Miller* (1983), 112 Ill. App. 3d 203, 209; see *In re Marriage of Melton* (1981), 93 Ill. App. 3d 338, 341, 417 N.E.2d 220, 223.) Remanding cases such as the one before us would only protract the litigation and clog the trial courts with issues which should have been disposed of at the initial hearing."

◼ Clearly, more evidence of the value of Alan's interest in Leff & Klein could have been received. (See *In re Marriage of Davis* (1985), 131 Ill. App. 3d 1065, 1069.) However, we decline to reverse and remand for a new hearing when to do so would, in effect, allow Marsha to benefit from her failure to introduce at trial evidence which she apparently had available to her, and where it is clear the court equated the value of Alan's interest in the business with its income potential to him, and considered that value in apportioning the parties' assets and in determining maintenance and child support. (*In re Marriage of Wilder* (1983), 122 Ill. App. 3d 338.) "Where the worth of a business and its future earnings are determined largely by the contribution and personal services made by plaintiff, definite valuation of the business is not required." *In re Marriage of Bauer* (1985), 138 Ill. App. 3d 379, 386, citing *In re Marriage of Greenberg* (1981), 102 Ill. App. 3d 938.

◼ We reject Marsha's alternative argument that the court should have accepted the $150,000 valuation of the business as shown on Alan's loan application. She argues the use of financial statements in valuing a real estate interest has been approved, citing *In re Marriage of Block* (1982), 110 Ill. App. 3d 864, and that the loan application at bar should be deemed even more persuasive evidence because falsification of such application is a Federal crime. As noted in *Block*, however, the valuation of assets is a question of fact, and the court here apparently determined the "desperate" circumstances under which the loan application was made undermined its competency. We note that Alan also testified that several certificates of deposit which were listed as assets on the loan application were not his but in reality belonged to his parents. Moreover, the $150,000 value ascribed to "net worth of business owned" on the loan application appears to reflect 100% of the worth of the business and Alan had only a 50% interest therein.

With regard to the court's division of the parties' assets and its award of maintenance, we find no abuse of its discretion; that is, we are unable to find that "no reasonable person would take the view adopted by the trial court." *In re Marriage of Bauer* (1985), 138 Ill. App. 3d 379, 386; *In re Marriage of Rapacz* (1985), 135 Ill. App. 3d

1045, 1048.

The court's judgment as entered and subsequently amended granted sole care, custody, control, and education of the parties' three children to Alan; ordered each party to pay his or her own attorney fees and costs incurred in the proceedings; found the value of Alan's accountancy was its income potential to him with which he would be able to pay maintenance, marital debts, and support of the children; and found that Marsha failed to establish the parties' home at 839 Edgewood Court in Highland Park was nonmarital and that it was marital property.

The court awarded Alan his interest in his accountancy practice, the 1973 Buick and 1979 Pontiac automobiles; the furniture, furnishings, and fixtures from the marital home as set forth on Alan's exhibit No. 8 admitted at trial (valued at a total of $20,980); his personal effects; the home located at 1393 Ridge Road (where he resided with the children), for which he was to be solely responsible for any debts thereon and was to hold Marsha harmless from any liability; and all bank accounts, money market funds or similar accounts in his own name.

Marsha was awarded the 1974 Ford automobile; the furniture, furnishings, and fixtures from the marital home as set forth on exhibit No. 8 (valued at a total of $28,500); her personal effects; and all bank accounts, money market funds or similar accounts in her name. The marital home, valued at between $275,000 and $300,000 was ordered to be sold. Prior to the equal apportionment of the net proceeds to the parties, various expenses and debts of the parties were to be paid out of the proceeds; to wit: the usual expenses attendant to sale of the home, including title expenses, broker's commission and attorney fees; the balance of the first mortgage ($67,000) and second mortgage ($17,500); outstanding joint marital debts totaling $15,400; Marsha's debts to her parents and a neighbor, and to her former attorney; and legal fees of $2,967.50 owed to the attorney appointed to represent the minor children. Additionally, Alan was to be solely responsible for the routine and extraordinary medical, dental, orthodontic, psychiatric or psychological expenses of the parties' minor children. Both parties were to contribute to the college education of the children based on their financial ability to do so at the time, either as agreed or as adjudicated. Marsha was awarded maintenance in the amount of $182.50 per week to be terminated or continued as necessary upon review at the end of two years, and the issue of Marsha's contribution to child support was reserved by the court.

■ We find no inequity in the court's division of the marital assets

and debts. In particular, we note Alan's apportionment of the proceeds of the sale of the marital residence was reduced at the outset in part payment of the substantial debts attributed to Marsha, notwithstanding he made support payments totaling $35,900 to her during the pendency of the proceedings and during which time Marsha was unemployed. Further, the court deleted from the list of marital expenses to be deducted from the sale proceeds a debt of $9,200 which Alan owed to his parents, which amount was borrowed for living expenses, and he was obligated to pay the mortgage on the home he purchased so that he and his children would have a place to live. Although the extent of furnishings awarded Marsha was less than that awarded to Alan, the value of those items exceeded Alan's by about $7,500, and the award to Alan necessarily took into account the fact that he had custody of two teenagers and a preteen. His eldest daughter had a driver's license and assisted with household administration, including shopping and chauffeuring her siblings various places on occasion.

We likewise determine no abuse of the court's discretion in its maintenance award. Marsha has 3½ years of college, had at least some experience in bookkeeping and secretarial work, and was proficient in home decorating tasks such as floor tiling, wallpapering, painting, installation of light fixtures and railings, and testified that she did any kind of repairs around the house which she was able to do. Marsha testified she is susceptible to ear infections, migraine headaches, and has a circulatory problem which occurs during cold weather. No other evidence concerning her physical health was presented.

In view of this record, we cannot agree that either Marsha's health or lack of experience would prevent her from obtaining meaningful or financially rewarding employment. Although she may lack experience in a business office setting, she has a high level of education. Moreover, even without seeking additional education, she has demonstrated skills in home decorating which she appears to enjoy and to take pride in and which we believe could become income-producing.

For these reasons, we find no abuse of the trial court's discretion in its division of property or award of maintenance.

Marsha next contends the court erroneously determined the residence at 839 Edgewood Court was marital property. She testified the home was the third residence that she and Alan purchased since their marriage in 1967. The previous residences were held in joint tenancy and the mortgages were in both names. Marsha testified that as far as she knew, title to the residence in question was taken in joint tenancy in April 1977, "and then Alan originally gave it to me. He told me he wants me to have the home to secure my future. He gifted it to

me. Then there was a quitclaim deed. He gave it to me immediately and he told me he has to have it filed." When asked if there was a conversation in 1977 with Alan regarding transferring the property into her name, she testified:

"He told me he put the house into my name. He wants to make it as a gift to me, to secure my future. He wants me to have it. And if I wanted, it is an absolute claim. He showed it to me. He says he has to give it back to his cousin to file."

Alan testified that he transferred the property to Marsha by quitclaim deed, which was backdated to April 12, 1977, and which was not recorded until April 4, 1978. He testified that he did this only to protect the property from a possible malpractice action against him, and that he did not intend the property to be a gift to Marsha. He testified the mortgage on the residence was in both names, and that he made all mortgage, tax, and insurance payments on the property until he separated from Marsha. Marsha testified that when they lived in the home previous to the one in question, she vaguely remembered something about Alan telling her he was involved in a dispute in which he might be sued for malpractice and that one of his clients was being sued. She testified she recently found the deposition given by Alan in connection with his client's case. It was found in the utility room of the Edgewood residence and it was dated September 1976. She testified she was unaware of its existence prior to finding it just three weeks earlier.

Marsha argues the facts of the backdating and recordation date of the quitclaim deed, and the time of the deposition, all negate Alan's testimony that the property was transferred for the protective purpose which he asserted. Further, she contends that, although the quitclaim deed in and of itself was insufficient to show that the transfer was a gift (*In re Marriage of Deem* (1984), 123 Ill. App. 3d 1019, 1021), her testimony sufficed to sustain her burden of proving that the property in question was intended to be a gift.

Where property is acquired during the marriage, the IMDMA's presumption in favor of its recognition as marital property (Ill. Rev. Stat. 1985, ch. 40, par. 503(b)) is controlling, and the "donee" spouse must rebut the presumption with clear and convincing evidence. (*In re Marriage of Rogers* (1981), 85 Ill. 2d 217.) "A spouse claiming property as a gift must 'show not only delivery, but also that the delivery *** was made "with the intention of vesting the title absolutely and irrevocably in the donee." ' (*In re Marriage of Simmons* (1980), 87 Ill. App. 3d 651, 654, 409 N.E.2d 321.)" (*In re Marriage of Weinstein* (1984), 128 Ill. App. 3d 234, 247.) We agree with the trial court's find-

ing that there was no donative intent. We find Marsha's testimony was not "clear and convincing" and, therefore, was insufficient to rebut the presumption.

■■ Marsha's final contention is that the court's award of custody of the parties' 15-year-old daughter Randee to Alan was an abuse of discretion because it was based on improper evidence and was against the preference of the child.

On July 10, 1984, two orders were entered directing the parties to attend conciliation conferences. The first order of record is handwritten and provides, in pertinent part:

"3. Parties to attend conciliation with Dr. Gienapp. Her report, or her testimony, shall not be used in a custody trial."

The second order was a preprinted form, identifying the parties, specifically directing conciliation counseling, and providing, in pertinent part:

"4. The parties agree that the referring judge or any judge sitting in his stead may review the conciliation report submitted by the agency."

Both of these orders were signed by the Honorable Harry Hartel.

A custody hearing was conducted before the Honorable George Pease on February 13 and 14, 1985. Marsha was at that time represented by a new attorney who had not participated in the July 10 proceedings. During the hearing, Dr. Gienapp's report was considered by the trial court and she testified at length. No objection to this evidence was interposed by Marsha's counsel. The trial court heard other evidence and interviewed the children in chambers. On February 15, 1985, the trial court awarded custody of all three children to Alan.

Marsha's counsel subsequently filed a motion for rehearing on February 25, 1986. The motion recited that although trial counsel had examined the record prior to the custody hearing, the handwritten order of July 10, 1984, had not been in the record. It was discovered by counsel sometime after the hearing. The motion was denied by the trial court, based on its opinion that Dr. Gienapp's examination had been made pursuant to section 605 of the IMDMA and also based on its opinion that counsel waived the issue due to his failure to object.

Marsha argues that the trial court's reliance on section 605 of the IMDMA (Ill. Rev. Stat. 1985, ch. 40, par. 605) was in error since, although the two orders may have been ambiguous with regard to whether disclosure of the results of Dr. Gienapp's examination may be made, both orders directed "conciliation" counseling and, thus, Marsha asserts, it is clear that section 404 was the enabling authority. (Ill. Rev. Stat. 1985, ch. 40, par. 404.) That section provides in pertinent part:

"The facts adduced at any conciliation conference resulting from a referral hereunder, shall not be considered in the adjudication of a pending or subsequent action, nor shall any report resulting from such conference become part of the record of the case unless the parties have stipulated in writing to the contrary." Ill. Rev. Stat. 1985, ch. 40, par. 404(b).

Marsha asserts there was no such stipulation here and the court was precluded from using the facts adduced in the conciliation conference. She further asserts it was error for the court to have found waiver where her counsel asserted the handwritten order was not in the record at the time he examined the court file prior to the custody hearing.

We disagree that the court's award of custody was based on improper evidence. As Alan points out, the form order directing conciliation specifically recited that it was for conciliation counseling regarding the issue of "custody, visitation," which words were handwritten in the otherwise preprinted form. Also, Dr. Gienapp's written report was prefaced with the words "The following sessions were scheduled as requested by the court to address the issues of custody and visitation." We find no error in the court's determination that the enabling legislation was section 605 rather than section 404. Evidence concerning the results of such ordered conciliation is specifically admissible under section 605:

"The investigator shall mail the report to counsel, and to any party not represented by counsel, at least 10 days prior to the hearing. The court may examine and consider the investigator's report in determining custody. The investigator shall make available to counsel, and to any party not represented by counsel, the investigator's file of underlying data, reports, and the complete texts of diagnostic reports made to the investigator pursuant to the provisions of subsection (b) of this Section, and the names and addresses of all persons whom the investigator has consulted. Any party to the proceeding may call the investigator, or any person whom he has consulted, as a court's witness, for cross-examination. A party may not waive his right of cross-examination prior to the hearing." Ill. Rev. Stat. 1985, ch. 40, par. 605(c).

In view of the admissible nature of this evidence under section 605, we find it unnecessary to address the issue of Marsha's counsel's waiver.

When the court interviewed Randee and asked her preference, she stated she wished to live with her mother. Marsha contends it was er-

ror for the court to award custody of Randee to Alan because "the child's desires are to be given 'most serious consideration,' " citing *Rosenberger v. Rosenberger* (1974), 21 Ill. App. 3d 550.

■■ In determining the custody of the child, section 602 of the IMDMA directs the court to consider, *inter alia*, "the wishes of the child as to his custodian." (Ill. Rev. Stat. 1985, ch. 40, par. 602(a)(2).) This has been construed to require that a mature child's preference as to custody be given considerable weight when it is based on sound reasoning. (*In re Marriage of McCune* (1980), 86 Ill. App. 3d 311.) The court is not precluded, however, from finding that the child's preference is not in the child's best interest. *In re Marriage of Siegel* (1984), 123 Ill. App. 3d 710.

■■ We note that when Alan was asked during the hearing if Randee had expressed preference for either parent, he testified that Randee told him she does not want to make a decision "because she feels guilty leaving her mother." Dr. Gienapp's report similarly observed that Randee was "the most conflicted and anxious emotionally" of the three children because she felt she might be happier with her dad, but would feel too guilty about leaving her mother. In her testimony, Dr. Gienapp recommended the children all be together and that there be liberal visitation with Marsha. She felt that Janice and Michael's preferences for living with their father were in accord with their best interests, but that Randee's stated preference to the court that she live with her mother was based on guilt and fear that something would happen to her mother if she were not there.

Based on this and other evidence presented at the hearing, we find no abuse in the court's discretion in its custody award.

Accordingly, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

HOPF and REINHARD, JJ., concur.